May it speak to the court. My name is Sam Harrison. I represent the plaintiff appellant in this case, Mr. Dustin Patrick. With the permission of the court, I'd ask to reserve three minutes for rebuttal. This is a case about a plaintiff who was severely injured after he was tased by the defendant, Deputy Moorman, running through a parking lot. The district court below made two key errors in resolving the case at summary judgment for Deputy Moorman. Those errors are, first, the district court ignored the entirety of plaintiff's expert testimony and substituted its own opinion for that of an expert's. Second, the district court substituted its own factual determinations for a jury's when it resolved four material factual disputes in favor of the moving party, specifically as to whether Deputy Moorman aimed his taser at Mr. Patrick's head, whether Deputy Moorman audibly warned Mr. Patrick about using a taser, whether a perimeter had been established, and whether or not there were alternatives available to Deputy Moorman as opposed to using a taser. Let's go back to the expert. The expert really opined on the ultimate issue. Did he not ask to the excessive reasonableness? Is that really appropriate or permissible? Your Honor, it's certainly not permissible for expert witnesses to make legal conclusions or to opine on the governing law of the case. That would usurp the judge's role in the case. However, in this case, we're dealing with industry standard testimony. And specifically, if I could point you to the record, the expert witness opines that it was reasonable under industry standards. This is the same exact testimony we saw from defendant's expert witness, who four times throughout his expert opinion used the word reasonable with relation to industry standards. And of course, in this circuit, it's clear that industry standard testimony is permissible. Berkeley tells us that, and a state of Smith tells us that in the 1983 context. Mere use of the word reasonable does not take something from the domain of permissible expert testimony as to industry standards into the domain of impermissible legal conclusions. And if we look at a state of Smith, we see that again, where this court held that the jury should have been presented with testimony by plaintiff's expert. The police responded unreasonably to a situation involving a known emotionally disturbed person. All right, so what specifically of the expert's opinion should have been admitted, or should have been considered? I submit, Your Honor, that everything should have been considered, because nothing was a legal conclusion. Because throughout the entirety of the opinion, the Fourth Amendment, which is the governing law of this case, does not get mentioned once. The reasonableness is pulled from the industry standard language. And so I would suggest that everything can be used. And I would point, for instance, when the District of New Jersey was dealing with this in Crowley, it noted that it was not prepared to exclude expert evidence that made occasional use of the word negligent. It's an exactly similar case here, to the extent that this court. Mr. Harrison, if I may interrupt you for just a moment. I didn't notice the citation of Crowley v. Clem, which is one of our cases, 499 F. 3rd 199. You might want to remember that. Which holds that whether an officer made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury. And when a district court submits that question to a jury, it commits reversible error. Now, that case is neither cited by any of the parties in this litigation. And I'm curious to know, in light of that holding, what your position would be, because we have taken a firm stand on this. Well, Your Honor, I would suggest that here we're not dealing with testimony as to a reasonable mistake of law being submitted to the jury. We're merely dealing with whether or not an officer's conduct conformed to industry standards. So, in this case, the reasonableness... We're dealing with the Baranski's testimony. That's what I thought we were dealing with when you were speaking. And the fact that the district court excluded his remarks about reasonableness. Am I incorrect in that? If I am, I'll stand corrected. He did exclude remarks. In fact, he excluded the entire expert opinion because it used the word reasonable. But, Your Honor, I would take issue with whether or not reasonableness is always going to be in the legal context. Here, he was talking about what a reasonable, what a typical officer would do, given these standards that are adopted by Pennsylvania, whether it's the MPOETC standard or the Berks County use of force policy, that both make use of the word reasonable. He really couldn't have opined about industry standards without using the word reasonable. And for that reason, I think it's why defendant's expert, Joseph Stein, when he quotes the MPOETC standard, uses the word reasonable again, because the word reasonable is in the standard itself. Berkeley tells us that industry standard is permissible. Likewise, in the State of Smith, we saw that industry standard testimony involving the word reasonable is permissible. To the extent that we're dealing with any impermissible legal conclusions in this case, I would suggest that it was an abuse of discretion to exclude the entirety of one expert's report and not exclude any of another's expert report when they're in the same vein, use the same terms, and discuss the standards in the same way. In this case, we've seen that this court, for instance, in Berkeley, can delete sections of an expert opinion that it finds to be legal conclusions and still consider the rest of it. But the court, I don't recall the court in its opinion relying upon the other expert. Did it? It didn't explicitly rely upon it, Your Honor, but it adopted the findings of it. alternative methods available to Deputy Mormon were either impossible or impractical. So to the extent that it didn't rely on it by citing it, it relied on it by making the exact same point. But that could have been a factual finding based upon the evidence, even looking in the light most favorable to Patrick, could it not? It would have had to be a factual finding based on the testimony of officers who said that this wasn't reasonable. That, of course, is probative only to the extent that there's a positive credibility determination, which we're not supposed to be making at summary judgment. And that's exactly what Abraham tells us when it says that cases that turn on credibility determinations aren't really supposed to be resolved at summary judgment. Right. But what evidence did Patrick produce that, looking at the light most favorable to that evidence, there were alternative means? He produced expert testimony that said there were alternative means available. Specifically, Mr. Baranowski opined, without using the word reasonable, that alternatives such as pepper spray, open-hand techniques Well, but given the facts of the case, pepper spray. Patrick is running in front of him. Pepper spray was of no avail. Using the nightstick, you know, if you get, you've got to get close enough to get the nightstick. And they weren't getting close. There wasn't the perimeter apparent. So I'm thinking the factual findings and the evidence, what does the case support from a factual standpoint in terms of options available? Well, if we look, for instance, Your Honor, at Officer Geld's testimony, that he could have caught up. He was going to catch him. He was going to catch him. Because he does, because he's determined. Sure. And he gets his man, always gets his man. And I think a jury would have been entitled to believe him to that extent. And in this case, he testified that he could have caught up with Mr. Patrick and he could have tackled him. I mean, that's a party that's not at all interested in Mr. Patrick's well-being, specifically while he was being arrested. And he was convinced that alternatives were available. That, bolstered by the fact that Officer Baranowski, or excuse me, Expert Witness Baranowski specifically agreed with him that it could have happened, I think is enough at summary judgment that a reasonable jury could return a verdict saying, an officer could have caught up with Mr. Patrick and could have tackled him, as opposed to using a far more serious piece of force, which is a taser. And that takes us into the factual findings because, of course, the exclusion of the expert testimony was not the only error the court below made in resolving the factual record. In resolving material factual disputes itself, it sat as a jury, and in so doing, committed reversible error. First, there's a factual dispute as to whether or not Deputy Mormon aimed at Mr. Patrick's head. Well, Mormon said he did not. So what raises an issue as to whether he did or did not? The presence of a probe in the back of Mr. Patrick's head. If we look at Abraham as well as Kudin. What does that have to do with whether he aimed? And intentionally aimed. How does that create an issue of fact? Where a projectile lands is circumstantial evidence as to where it was aimed to land. That's the holding of Abraham. Aim is with authority. Mr. Harrison, Mr. Harrison, are you acquainted with the record which states that a taser uses compressed gas to fire two probes? There was only one shot. There were two probes. Do you agree with that? I do, yes. That's from Joseph Stein's expert testimony. Well, now, how can you tell me when one of the probes struck the victim in the back and one struck the victim in the head that he was only aiming at the head? How can you tell? What evidence is there? Your Honor, I think there were two probes. And Mr. Patrick couldn't testify, didn't testify as to that at all. And if he had testified, it could not have been the predominance of evidence that he aimed at the head. But there's no testimony. The only testimony we have is the testimony of Mr. Mormon. What do you do with that? Absolutely, Your Honor. To address an initial point, we don't need to show a predominance of the evidence at summary judgment here. We just need to show that if believed, it would have been sufficient. Well, how can you possibly make the statement that he aimed at his head? How can you do that when there were two probes and one of them hit him in the back? I agree with you, Your Honor, that it's ambiguous. But I also believe that a jury, upon hearing Deputy Mormon's testimony and not believing him, would have gone to the next best thing, which is the presence of a probe in his head, which is circumstantial evidence of where he aimed. And that's, again, from Abraham. So you're saying when we look at something in the light most favorable to the moving party, we assume the jury disbelieves the other side's testimony? I don't think that's in our case law. I think there needs something to undermine it. Absolutely. Well, more than that, Curley says it doesn't go to a jury at all, that the issue is for the court. The reasonableness in an official immunity case, in a qualified immunity case, is for the court. It's not for the jury. Judge Jordan wrote that in 2007. What about that? Again, I think what is for the jury to decide, and in looking specifically at the jury's role, it's to resolve somewhat ambiguous facts. And certainly, Your Honor, we don't assume that any witness's testimony is not credible. But what we do do at summary judgment is assume that testimonial evidence is subject in the future. Judge Garth is making a different point, right? Judge Garth is making the point, let's put aside the factual discussion that you're having at the moment, and let's go to qualified immunity and reasonableness. And if we do that, it's a question of law that the district court presumably has resolved, and resolved correctly. And your charge right now is to show how that conclusion was incorrect. Because obviously, qualified immunity can resolve this. Either way, no matter how we come out on the point that you're pressing, right? Absolutely. And I see my time has expired, if I could. Answer this, please, if you would. Absolutely. Certainly, this is a legal determination by the court at summary judgment. The court is to resolve reasonableness, but it has to be based on the undisputed facts and facts that are construed in the light most favorable to the doctor. Mr. Harrison, you misstated. The court is to decide qualified immunity as well. It's the qualified immunity that we're talking about, not just the summary judgment. And I haven't heard anything about it being clearly established. Let's put another 24 minutes on. And give us your best case, if you will, that there should be no qualified immunity here. Because that's really at the heart. I mean, as part of that analysis, Judge DelZell determined that the force wasn't excessive. But also, there's a question of clearly established law. What's your best case for the proposition that what was done here, that police officers should have known under clearly established law that it was excessive and improper? Well, Your Honor, if you're looking for a specific case citation, it'll be challenging to find. But I think if you need a case that says that it's inappropriate to use excessive use of force to stop a fleeing suspect, I would point to Abraham. But I think searching for an exact one-to-one factual correlation between previous precedent and the facts of this case misses the functional inquiry of the second prong of saucier at qualified immunity. If we look at this Court's pronouncement in People of Three Mile Island, courts cannot be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement. Insisting on a precise factual correspondence between the conducted issue and reported case law is tantamount to such a license. But you can focus on reasonableness for us. What's inherently unreasonable about what the officer did? Which the officer has said to himself, ah, this is clearly excessive. Again, looking at the facts most favorable to the non-moving party, he should have said, I shouldn't aim a taser at the head. That violates my training. He should have said, oh, I should have warned. This Court has held that a warning regarding taser use is material. There's no genuine dispute about the warning. I mean, I thought that the district judge went through a rather painstaking analysis of what exactly Mr. Patrick said and how that was different than our case law and whether that created a genuine issue. And he came to the determination that it didn't because Mr. Patrick didn't say it didn't happen. Mr. Patrick, who's under the influence of several drugs, three or four come to mind, said, I can't say that it didn't happen. It's just in the state of mind that I was in, I don't recall. Didn't hear it. I didn't hear it. So I didn't hear it doesn't mean it didn't happen, I think, was the district court's point. So what are we to do with that to think that that is an improper interpretation of what's going on and that it does something to dispel the grant of qualified immunity? Well, I think the reason there's a material factual dispute there is, yes, Mr. Patrick's testimony isn't decisive. He doesn't say outright, I did not hear a warning. I know no warning was given. But he says he doesn't recall one. Officer Gelt says he doesn't recall a warning being given. Officer Moyer says he doesn't recall a warning being given. Ostensibly, these officers were certainly in a much clearer state of mind than Mr. Patrick. And all three of these potential witnesses' testimony creates a reasonable inference, I think, that if none of the three people other than Deputy Mormon can remember a warning being given, then perhaps no warning was given at all. And does that tick the scale in terms of reasonableness, the warning alone? Your Honor, I think it does. It certainly is material to the determination of reasonableness. If we look at Brown v. Kwinert, just in the past year, this Court has said specifically that whether or not a warning is given before a taser is absolutely material to the determination of reasonableness. And had the district court considered this below, I think it certainly might have affected its outcome as it pertained to the first prong of qualified immunity. Getting back just briefly to the clearly established nature of the case law, everybody knew what was going to happen here. Deputy Mormon's training told him not to fire at the head. It told him to warn. It told him that he shouldn't fire a taser at somebody who was running. And I see again my time has expired, if I could just briefly conclude. Finish your thought. He knew what happened here. And as was recently noted in the Eastern District of Pennsylvania, the police do not need judges to explain the obvious to them before they can be held accountable for an unreasonable or excessive use of force. I thank the Court.  We'll hear from you again on rebuttal. Good morning. Good morning. Good morning. May it please the Court, my name is Andrew Adair. I represent the appellee, defendant, deputy, Berks County Deputy Sheriff Michael Mormon in this appeal. And there's 15 minutes that I've got here to discuss these issues, and I would like to start with talking about the issue of qualified immunity because I believe that's something that Judge Garth, you in particular, put your finger on very early as the issue in this particular case. First of all, qualified immunity applies in 1983 cases across the board. We've got a case here which involves the reasonable use of force or unreasonable use of force, depending on which side you're looking at it. Well, in this particular case, because it's excessive force, there's a multiple-factor test that was set forth initially by the U.S. Supreme Court in Graham, followed up by this Court in Sherrar and a whole number of other cases. These are a number of different factors that have to be balanced against each other to determine whether the use of force was reasonable. Well, you take, first of all, the question of whether the force was reasonable, and then you have to look at whether there's qualified immunity. And under these alleged disputed facts that the plaintiffs have identified in this case, I'm going to suggest to you that there are no facts that will tip the balance in favor of Mr. Patrick in this particular case. While there may, in fact, be some disputed facts, and we deny that, but even if you assume that there are, Mr. Patrick succeeds on one or two of them, the use of force in the totality of the circumstances, viewed from 100 feet off the ground, as this Court is to do, the scale doesn't tip in favor of Mr. Patrick. Well, how about the use of, how about the existence of other options? I mean, we have a, the plaintiff's a strange bird. It's kind of been painted and he was lurking around the dumpster and he had all these drugs in his system and baggy clothes and he presents a note with a stick figure on it. I mean, it's not, it doesn't appear to be like a hardened criminal as such. It seems a little bit out of the ordinary, if you will, and passes by other pedestrians with, you know, totally non-aggressive. How about other options? I mean, Geltz said I was going to catch up with him. There's 30 other officers coming to the scene. Judge Geltz found that there was no intention of his going into the building, that that was unreasonable for the police to have thought of that. You know, he's running over a driveway, running, and you taser him, he's certainly going to fall on McAdam and probably going to hurt himself. Wouldn't that be something that is, so it's excessive to do that, given all these other alternatives in this situation? Your Honor, if I may address those, I mean, that actually raises a number of different questions, both factual as well as legal. First of all, Officer Geltz is a red herring in this case because what Mr. Patrick hasn't identified, sure, Officer Geltz says, I could have caught him. What Mr. Patrick hasn't identified is any evidence that Deputy Moorman even knew that Officer Geltz was involved in the chase. Officer Geltz doesn't say, hey, Deputy Moorman saw me. In fact, Deputy Moorman and the police officer behind Deputy Moorman, Officer Moyer, didn't see Geltz. But with respect to the use of other options, plaintiff has argued, and plaintiff's expert, if you want to admit the opinion of plaintiff's expert, they have argued in this case that the use of substantial force was justified. Plaintiff's expert actually says, Mr. Baranowski said as soon as Mr. Patrick came out from the dumpsters, he could have been pepper sprayed, open hand techniques, even before he ran. And then after the chase began, the use of the collapsible baton would have been appropriate. Those are intermediate level force. It's been identified by several courts, as is the taser. And this gets back to the issue with qualified immunity. What plaintiff has not presented here is any case law that as of May 8, 2009, it was clearly established that in a case where you had the facts of plaintiff had committed a serious crime, he was fleeing or otherwise resisting arrest, and the apprehension of the plaintiff would require the substantial use of force. Under those circumstances, there was no case law that said the use of a taser was inappropriate. So I guess what I'm saying is the need for the use of force is not crystal clear here. Granted, he's fleeing and he committed a robbery, a bank robbery, so under Graham perhaps, but we're just not sure. We can't paint the entire picture as well as a jury. It might be painted in front of a jury, with Mr. Patrick testifying as to what was going on and his mental state at the time. Well, Your Honor, Judge Garth put his finger on it earlier with the Curley v. Clem. I mean, we did not cite to Curley in our opinion, but we cited to Carswell v. Borough of Homestead. It has the same proposition in there. It follows up on a line of cases, and it has to do with the question of qualified immunity, which this court has recognized and properly recognized. Reasonableness under qualified immunity is for the court to decide. It's not for the jury to decide. So whether the jury would have decided that that was reasonable is not relevant to the qualified immunity analysis before this court. But what we have here is we've got a police officer making split-second decisions. It's a bank robbery. We have an individual who is in the presence of a police officer. Mr. Adair, let me interrupt you for just a moment. Certainly. Because you touched on something I'd like you to amplify. Certainly. I have never seen a Taser gun, and I did not know that a Taser weapon only would discharge two pellets or two probes or two projectiles with one shot. The testimony, as I understand it, that is challenged by your friend is that Mr. Mormon claims he aimed at Patrick's back, and one of the probes struck him in the back. Do you have anything to add to us, to add for us, as to what happens when there is an aiming at a particular object and it misses or it goes astray because one of the projectiles hit him in the head? Does this diminish Mr. Mormon's testimony? Does this in any way affect it? Does it mean he was aiming at the head rather than the back? Can you explain this to us, and then would you go back to your issue of it's clearly established, which I'm primarily interested in? Your Honor, with respect to the Taser and aiming at the back or aiming at the head, Mr. Mormon, Deputy Mormon, testified that he was, in fact, aiming at the back. Officer Geltz, who was running behind, said that he saw Deputy Mormon aiming through the open sights at Mr. Patrick's back. The fact that you've got a low-velocity projectile, or two low-velocity projectiles that shoot in a dynamic situation where a police officer is running and bouncing around, it's not as accurate as a high-velocity projectile such as a gun. The Berks County Taser policy, in fact, recognizes that you're not supposed to intentionally aim at the head, but it recognizes that occasionally the projectile might strike another part of the body. Now, here is the issue with respect to aiming at the head. Mr. Patrick presented no evidence whatsoever at all, medical or otherwise, that indicates that hitting somebody in the back of the head had any different impact than if both prongs had struck Mr. Patrick in the back. The testimony, the discovery testimony, was that you don't aim for the head because you don't want a prong to hit somebody in the eye and to blind it. When... So the policy, here Mr. Patrick's alleging that Deputy Mormon violated a policy of the Berks County Sheriff's Department. This court has recognized in the Calvin v. Duffy case, and, Your Honor, Judge Greenaway, it's my understanding you were on the panel in that case, has at least recognized that a violation of a local policy or procedure is not a violation of the Fourth Amendment necessarily. And that goes back to a long line of U.S. Supreme Court cases, including Wren v. the United States, in which the court found that a violation of a policy doesn't rise to the level of... is not necessarily the same thing as a violation of the Fourth Amendment, because the Fourth Amendment is what it is. Police policies change. There's a number of other cases. There's also Davis v. Scherer, another Supreme Court case, which basically says that evidence of violation of a local policy or law in that case is an evidence of objective unreasonableness for qualified immunity purposes. So I guess my point is this, Your Honor. We have a dynamic situation. We've got testimony that Officer Patrick aimed at the back. We have nothing that contradicts that he actually aimed at the back other than where one prong went. But that doesn't even contradict his testimony. That could even be consistent. The cases that plaintiff relies on, Abraham and the Cowden case, in both of those cases there was physical evidence that actually belied and made impossible the officer's testimony in those cases. And we don't have that here. What about the... Thank you. What about the issue of warnings? Your adversary said that there was a genuine issue created as to whether Officer Mormon actually gave a warning. Well, I'll address that. First of all, without getting too deep into the actual testimony, Mr. Patrick didn't remember. He testified he didn't hear it. He said both. He said he didn't hear it, and then he said, I don't recall that anything was said. He says, yeah. I believe he says both of those. And I apologize if I misspeak. He says both of those. But the other officer, Officer Moyers, who's following behind, says, I'm on the radio. I'm calling out where this guy is, and I'm not paying attention to whether anything is said. And the third officer, Officer Geltz, testified, I recall something was yelled, but I don't recall what. What the plaintiff hasn't established here is that you've got something that was said and that someone would necessarily have remembered it. That's what's lacking in plaintiff's argument there. But you have three people who didn't hear. That's not true. Against Mormon, who says he did. You have two that said something was said. Officer Geltz said something was yelled, but he didn't recall what. And that's different than saying nothing was said. But let's take this, take a step back, and let's look at that factor, because that's only one of the factors in the big picture here. And under the circumstances of this case, where nothing allegedly is said, you've got a bank robber who threatened with a note to shoot a teller. He is in the presence of a uniformed police officer. When he sees that officer, he runs and he testifies, I was running for freedom, I was running to get away. Under those facts, taking this case in the totality of the circumstances, putting it all together, I suggest to you that the failure to warn, even if you assume that there was no warning given, doesn't tip the balance in favor of Mr. Patrick. Getting back, and I don't believe I ever finished answering the qualified immunity issue that I had started and Judge Garth had asked me to come back to. I don't exactly remember where I had left off. But I do, you know, my... That clearly established. You were going to talk about clearly established. Well, actually...  You began and you were talking about the actual issue. The apprehension required substantive use of force and there's no case law. Thank you, Your Honor. And that's exactly where we are at this case. Plaintiff acknowledges, his own expert acknowledges, that substantial force was reasonable. He says that the use of the collapsible baton or pepper spray would have been reasonable. Plaintiff has argued that. There simply is no case law as of May of 2009 that said under those circumstances the use of a taser would have been inappropriate. I guess maybe I did finish that argument up and I apologize. Well, there's a lot of case law that... saying there's not a lot of clearly established taser case law. But someday, there's got to be a taser case. And maybe a couple of them would make it clearly established. That would be correct. But remember the circumstances here. This isn't... The case law that says the use of a taser is excessive to date, where a taser has been found excessive, have been cases where the plaintiff was either... alleges they were compliant or they allege that after they had been brought into compliance, the taser was continued to be used. There isn't any case law that I found even outside of... Well, there are some cases in California that have found that the use of a taser may be excessive. But in those cases, qualified immunity was granted there for the reason that you just recognized. The other issues in this case, Your Honor, the issue of a perimeter. There were 11 police officers deposed from three different jurisdictions. Nobody identified a single police officer who was not only on the perimeter, but was actually stationed on Berkshire Boulevard at the area where this was taking place. Despite all these depositions, the plaintiff came forward with no evidence to show there was somebody who was actually there. And the other issue in this case is the presence of a medical bill. Now, the plaintiff and Judge Dalzell, in fact, discounted that. But if you look at the plaintiff's discovery answers, the plaintiff admits that between where he was and where he was running was, in fact, a medical office building that was open to the public. The plaintiff denies he was headed to it, but all three officers testified that they reasonably believed that that's where the plaintiff was headed. With that being said, I see my time is up and I apologize, and so I just ask the court to find and to affirm the disreport. Thank you very much. Thank you, Mr. Jay. Thank you. Mr. Harrison? I just have a couple points. And, Judge Garth, I'd like to immediately address your point about qualified immunity and whether it's a legal determination or a factual one. Certainly qualified immunity and whether it attaches based on clearly established precedent or clearly established rights is a legal determination, and that was certainly for the court to make. However, when the foundation of that legal determination depends on facts, and Saussure tells us that it does, improperly determining those facts robs the legal determination of any accurate foundation. In this case, the primary upshot from our opening brief is that the facts here were wrongly decided. Now, do you mean they were wrongly decided, or do you mean that there were, in fact, genuine disputes as to material fact and the district court failed to recognize that? That's exactly it. What I should have said, Your Honor, is that the factual disputes were wrongly resolved because they were genuine disputes and should have been presented to a jury. Further, to address Apelli's point here, I think that Deputy Mormon expects too close of a factual correlation between previous precedent and what's at stake in the instant case. If we look, for instance, at this court's jurisprudence in Burns, in that case, the court reasoned, despite no United States Supreme Court case dealing with tightened handcuffs, despite no Third Circuit court case dealing with tightened handcuffs, nevertheless, the right could be clearly established without any one-to-one correlation between that and a previous case. Likewise, if we look at Kooten, there it was determined that qualified immunity didn't latch because of Abraham, where a gun was used, and in Kooten, where a flashlight was thrown. I think it's much less of a leap to liken a gun and a taser, both quasi-lethal force and, in fact, in a gun, actual lethal force, than a gun and a flashlight. We can be a little bit broad when we're dealing with qualified immunity here because, simply, when you have a new piece of technology, you offer officers, perhaps, the right to use it It's a more difficult argument to make when it's just one. A tase, I guess, is the noun, right? He used it once, he tased once, whatever. Obviously, if he had done it multiple times, it makes that a better argument. Well, it certainly would have made it more unreasonable. I agree with that. But here, we're not just dealing with one tase. We're dealing with the choice to tase, and frequently in lethal force cases, we're dealing with one shot, and that's not necessarily decisive. Here, we're dealing with the decision to tase under a totality of circumstances that leads us to believe that when resolved... Isn't your client, like, five inches taller and... He's a big guy. ...40 or 50 pounds heavier? I mean, the notion that, you know, this isn't, you know, the prose where a safety can take out, you know, a tight end. You know, we've been talking about, well, you could put the tot on him, you could tackle him. That sounds, frankly, unrealistic. Your Honor, it might be unrealistic, and that kind of seeks out the same kind of weighing that we ask a jury to do. Was it realistic for him to actually tackle? We don't know. Certainly, we have competing testimony from Officer Delz, who is no more of a physical specimen, I would say. But who your adversary mentions, Mr. Mormon was unaware of his positioning, station, wherever. Mormon's on a task. He's focused. I mean, in order to create a genuine dispute, you have to make or present evidence that Mormon's aware that, you know, someone's to his left, someone's to his right, and that they're descending on him, and that he can see that the force that he thought about using was therefore unreasonable because of what he could see. And that's not what the state of the evidence is. Your Honor, we don't actually have to show what Mormon was thinking. We just have to show what circumstances were available. No, no, I'm not talking about what Mormon was thinking. I'm talking about what Mormon saw. I mean, your mention of the officer who says, I could have chased him down is great, but Mormon wouldn't have been aware of that. And if you can't present facts that you can reasonably infer that Mormon should have been aware of, then you can't say that what Mormon did was inherently unreasonable. That's true, Your Honor. But if Deputy Geltz from farther back could have tackled Mr. Patrick, I think the inference is there that Deputy Mormon, who is closer to Mr. Patrick, could have also pursued that same result. And whether a jury, upon seeing Mr. Patrick, decided that could have never happened, he's too big, it was smart to use a taser, I think it nevertheless does not give an officer the opportunity to aim a taser at the head and do it while the person is running over pavement, something his training explicitly told him not to do. I see my time has expired. I thank the Court. Thank you, Mr. Harrison. You did an excellent job, Mr. Adair. Thank you. The case is very well argued. We appreciate your effort on behalf of Mr. Patrick, Mr. Adair, on behalf of your client, and we'll take the case under advisement.